UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 20-cr-10266-RGS |
| | ) |
| (1)   CHENGUANG GONG and | ) |
| (2)   YALAN TANG, | ) |
| | ) |
| Defendants. | ) |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The defendants, Yalan Tang and Chenguang Gong, stand convicted of entering a conspiracy to illegally introduce misbranded drugs into interstate commerce with intent to defraud and mislead, and—in the case of Tang—also to introduce into the commerce of the United States merchandise imported through false and fraudulent means.

Their crime involved selling misbranded drugs and falsely labeling their products as "For Research Purposes Only" while knowing full well their customers were using the products as performance-enhancing drugs.

To reflect the seriousness of this conduct, to impose a just punishment, to promote respect for the law, and to deter others from engaging in similar unlawful conduct, the United States respectfully requests that this Court (i) impose a sentence upon Tang of 30 months incarceration, a fine of $250,000, 12 months of supervised release, and a mandatory special assessment of $100; and (ii) impose a sentence upon Gong of 27 months incarceration, a fine of $250,000, 12 months of supervised release, and a mandatory special assessment of $100.

For the reasons set forth below, the government respectfully submits that such a sentence is sufficient, but not greater than necessary, to achieve the objectives set forth in 18 U.S.C. § 3553(a).

FACTUAL BACKGROUND

Gong and Tang, a married couple living in Massachusetts throughout the time of the charged offense, are highly educated professionals who have studied and worked extensively in the chemistry and pharmaceutical fields. Chenguang Gong Presentence Report ("Gong PSR") ¶ 8; Yalan Tang Presentence Report ("Tang PSR") ¶ 8. Together they ran Ycells, LLC, a limited liability company incorporated in Massachusetts. *Id.* Ostensibly operating Ycells as a legitimate biotechnology company, Gong and Tang used Ycells to unlawfully import and distribute illegally misbranded performance and cosmetic-enhancing drugs. Gong PSR ¶ 17; Tang PSR ¶ 18.

To commit their crime, Tang and Gong rented multiple UPS boxes in the greater Boston area to avoid scrutiny from customs officials and to avoid having their drug-products seized upon entry to the United States. Gong PSR ¶ 19; Tang PSR ¶ 20. Tang used an email address associated with Ycells to provide the addresses of these UPS boxes to suppliers of the drugs in China along with false names to be used as the addressees of the packages shipped from China. Tang PSR ¶ 21. Chinese suppliers shipped drugs to the UPS boxes with these false names and with false and misleading labelling, including false claims that the products were intended "For Research Only"—when, in fact the products were intended for human consumption. Gong PSR ¶ 21; Tang PSR ¶ 22. The defendants also used codes to obscure the identity of the drugs that they were importing and reselling throughout the United States. Over the course of their conspiracy, Gong and Tang received *hundreds* of packages shipped from China containing misbranded dugs. Gong PSR ¶ 26; Tang PSR ¶ 27.

Once the products were received in the United States, Gong and Tang worked together to repackage the drugs for shipment to U.S.-based customers. Gong and Tang packaged drugs into human-dose size vials and titrated drugs with reagents and solvents to prepare them for human

consumption either orally or through injection. After packaging the products, the couple then shipped those products to customers in multiple states across the United States. Gong PSR ¶ 26; Tang PSR ¶ 27.

Ycells offered dozens of drugs for sale to customers. Gong PSR ¶¶ 25-26; Tang PSR ¶ 26-27. The products Gong and Tang sold through Ycells included drugs that were intended to be ingested by their customers to enhance human performance. These performance enhancing drugs included drugs commonly used by bodybuilders and athletes to enhance muscle growth and strength, improve cardiovascular performance, and improve endurance.

Other drugs Gong and Tang sold were intended to improve cosmetic appearance, prevent or slow signs of aging, improve cognitive function, and improve sexual performance. Gong PSR ¶ 18; Tang PSR ¶ 19. Some these drugs were FDA-approved for sale only as prescription drugs, while others had no regulatory approval. Gong PSR ¶ 19; Tang PSR ¶ 20.

Though they labeled the products as "For Research Use Only" and "Not for Human Consumption," Gong and Tang understood that the products were performance-enhancing drugs intended for human consumption—and therefore that this labeling was false. Among other things, customers sent emails to an email address associated with Ycells referring to (i) the "taste" or "flavor" of the products; (ii) desired effects of the products on human customers; (iii) unwanted side effects, such as dizziness; and (iv) the need for sterility and for products to be U.S. pharmaceutical grade and to be manufactured in accordance with good manufacturing practices. Gong PSR ¶¶ 27-28; Tang PSR ¶¶ 28-29. Gong and Tang falsely labeled their products as "For Research Use Only" and "Not for Human Consumption" as a ruse to avoid regulatory enforcement and law enforcement scrutiny.

From 2016 through 2020 Ycells generated revenue of $2,538,920 from the sale of misbranded drugs and earned profits from those sales of approximately $610,563.98. Gong PSR ¶¶ 29-30; Tang PSR ¶¶ 30-31.

CALCULATION OF THE SENTENCING GUIDELINES

The government calculates both Gong and Tang's total offense level to be 19, calculated as follows:

|  | Offense Level |
| --- | --- |
| Base offense level for Food, Drug and Cosmetic Act Violations involving Fraud (U.S.S.G. § 2N2.1(c)(1)) | 6 |
| - Loss Amount is Greater Than $1.5 Million But Not More Than $3.5 Million (U.S.S.G. § 2B1.1(b)(1)(I)) | +16 |
| - Use of a Special Skill (U.S.S.G. § 3B1.3); | +2 |
| - Zero-Point Offender (U.S.S.G. § 4C1.1) | -2 |
| - Acceptance of Responsibility (U.S.S.G. § 3E1.1) | -3 |
| **Total Offense Level** | **19** |

***The Use of a Special Skill Enhancement***

U.S.S.G. § 3B1.3 provides a two-level enhancement "[i]If the defendant … used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."

Gong and Tang are both highly trained and educated professionals. Gong received an undergraduate degree in physics, a Master's degree in bioinformatics, and a PhD in biochemistry. Gong PSR ¶¶ 76-78. He has won numerous academic awards and published papers in a number of academic publications, including Nature magazine. *Id.* Tang has an undergraduate degree in pharmaceutical engineering and has helped to develop FDA-approved drugs. Tang PSR ¶¶ 77-78.

To carry out the charged conspiracy, Gong and Tang received bulk drug materials at their home. In a home laboratory, they used their specialized knowledge in the chemistry and pharmaceutical fields to repackage, titrate, and mix drugs into solvents to prepare them for human

4

consumption, Gong PSR ¶ 27; Tang PSR ¶ 28, often taking steps to ensure purity, effectiveness, and potency, and mixing custom formulas for their customers. Such conduct plainly warrants application of the "special skill" enhancement under U.S.S.G. § 3B1.3. *See* U.S.S.G. § 3B1.3 cmt., App. Note 4 ("'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, *chemists*, and demolition experts.") (emphasis added).

### *Application of the Fraud-Loss Enhancement*

Based upon bank account and other records obtained during the investigation, the government determined (and Gong and Tang have agreed) that the defendants received gross proceeds of at least $2.5 million from the illegal sale of misbranded drugs. *See* Gong PSR ¶¶ 29-30; Tang PSR ¶¶ 30-31.

As described above, these illegally misbranded drugs included the active ingredients for FDA-approved drugs, as well as drugs which have never been approved by the FDA. Gong PSR ¶ 8; Tang PSR ¶ 9. U.S.S.G. § 2B1.1, application note 3(E)(v)(III) expressly states that for "goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss **shall include** the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." (emphasis added).

The defendants' conduct falls squarely within the text of this guidelines commentary. Gong and Tang sold misbranded prescription drugs for which regulatory approval was required. Precisely as the commentary mandates, the loss for purposes of Section 2B1.1's loss table "shall

include" the amount paid for those products—which the parties agree is well in excess of $2 million.

The defendants offer two objections. First, they contend that there is no loss whatsoever; the customers received what they paid for and were not themselves defrauded. According to the defendants selling misbranded and potentially dangerous drugs—is a harmless and victimless offense. But that contention is specifically rebutted by this commentary: Selling misbranded drugs is itself a harm—regardless of what the customers knew, because those drugs are dangerous and are banned from sale absent regulatory approval. To measure that loss—the potential for infection or disease or other harm—the commentary creates a proxy rule based upon the gross sales of the illegal and dangerous and banned products. The sale itself is a harm—because it poses a risk to customers regardless of whether they have accepted that risk—and the commentary language provides a means to measure that loss. *See United States v. Goldberg*, 538 F.3d 280 (3d Cir. 2008) ("F.D.A. approval was required for these drugs to be sold — they were prescription drugs after all. There was no such approval because the drugs were misbranded. This means Goldberg was selling goods for which regulatory approval was required but not obtained. Therefore, under cmt. 3(F)(v), the District Court's gross profits methodology was proper.").

Second, the defendants argue that the application note is an impermissible interpretation of "loss" under Section 2B1.1 because "its definition of 'loss' is contrary to the unambiguous text of the guideline and must, therefore, be rejected" under *Kisor v. Wilkie*, 588 U.S. 558 (2019). Def. PSR Objection #2.

To date, the First Circuit has not determined whether *Kisor* abrogated *Stinson v. United States*, 508 U.S. 36 (1993), in which the Supreme Court held that the Guidelines commentary "must be given controlling weight unless it is plainly erroneous or inconsistent with the

regulation," *id.* at 44-45 (cleaned up). *See United States v. Gadson*, 77 F.4th 16, 20 (1st Cir. 2023). However, whether under *Stinson* or *Kisor*, the commentary language is a permissible interpretation of the term "loss." Under *Stinson*, this commentary language is far from "plainly erroneous." Under *Kisor*, the term "loss" in this context of measuring the harm from the sale of misbranded products, is ambiguous, the commentary's application note falls within the permissible "zone of ambiguity," and this plainly is an exercise of the Sentencing Commission's "substantive expertise" and "fair and considered judgment."[1]

Finally, application of the Section 2B1.1 loss table makes practical sense. Section 2B1.1 provides a means to translate the scope and scale of economic offenses into workable guidelines calculations. Here, Gong and Tang sold a flood of dangerous, misbranded, and illegal drugs to their customers; the scope of their conduct was large and so were their receipts. The sanction they face should appropriately account for the scale of their operation; it would make no sense for their guidelines to be no different than if they had sold only a minimal amount of drugs.

APPLICATION OF THE FACTORS UNDER 18 U.S.C. § 3553(a)

In determining a defendant's sentence, courts must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the court's

---

[1] *Kisor* clarified when courts should defer to an agency's interpretation of its own regulation. First, the regulation must be "genuinely ambiguous" after "exhaust[ing] all the 'traditional tools' of construction," including analyzing the regulation's "text, structure, history, and purpose." *Kisor*, 588 U.S. at 574-75 (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). Second, if the regulation is ambiguous, the agency's reading must fall within its "zone of ambiguity." *Id.* at 575-76. And third, the "character and context" of the reading must entitle it to controlling weight. *Id.* That is, the reading must be the agency's "official position," "implicate [the agency's] substantive expertise," and reflect "fair and considered judgment." *Id.* at 577-79.

"starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the court should consider the various factors set forth in 18 U.S.C. § 3553(a).

Here, the government's recommended sentences of 30 months incarceration for Tang and 27 months incarceration for Gong are reasonable and appropriate in light of the § 3553(a) factors. The recommended sentences are sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense, afford adequate deterrence, promote respect for the law, and avoid unwarranted sentencing disparities, while also taking account of the defendants' personal characteristics. *See* 18 U.S.C. § 3553(a)(2).

***The Nature and Seriousness of the Offense and the Need to Provide Adequate Deterrence and Promote Respect for the Law***

Three characteristics of Gong and Tang's offense stand out as aggravating factors warranting a stern sentence.

First, while their joint offense involves a conspiracy to violate a complex regulatory statute, their offense was not a result of ignorance, inadvertence, or mere bad judgment. Instead, they acted knowingly and willfully with a full understanding of the wrongfulness of their conduct. Indeed, defendants demonstrated fulsome consciousness of their guilt and the need to avoid detection. As detailed above, defendants took steps to hide their conduct and avoid detection from law enforcement authorities. This included renting multiple mailboxes across the greater Boston area to receive packages shipped from overseas, using phony names and falsified invoices to avoid customs detection, and falsely labelling products as "For Research Purposes Only" in the hope of avoiding law enforcement scrutiny. Put simply, innocent people—and those who believe they are innocent—do not lie and cover-up their conduct. These steps are evidence of a guilty mind.

Second, the scale of the defendants' conduct appropriately drives the guidelines calculation—and this same scale of operation warrants a greater sanction. The defendants operated

on a massive scale. They received *hundreds* of shipments of drugs from China and then repackaged and shipped these illegal drugs throughout the United States. From their operation, they received gross proceeds of *millions* of dollars and profits—based on conservative calculations—of *hundreds of thousands* of dollars.

Third, perhaps no court in the country has a better understanding of the dangers of mixing, packaging, and shipping misbranded drugs than this one. In their basement, Tang and Gong operated an illegal and dangerous pharmaceutical lab—mixing, titrating, and packaging drugs knowing that they would ingested or injected by their customers. Email correspondence between Ycells and its customers even reflect that the defendants (i) knew the importance of complying with pharmaceutical GMPs—good manufacturing practices—the standards necessary to ensure that drugs are safe for human use and will not cause harm or disease; and (ii) were aware that their products may actually be causing unwanted side-effects such as dizziness. Gong and Tang recklessly disregarded these risks and continued to ship illegal products to their customers. In short, Gong and Tang operated an uninspected make-shift home laboratory and put their customers at grave risk of harm.

Far from being a victimless regulatory offense, Gong's and Tang's conduct was intentionally wrongful, highly dangerous, and executed at a great scale. The Court should meet such conduct with a serious sanction that reflects the scope and seriousness of the crime. In addition, a significant sanction is necessary to deter other would-be offenders, particularly in light of the substantial profits Gong and Tang earned. A mere slap-on-the-wrist, conversely, would

signal to other would-be offenders that this offense offers the opportunity of great profit with little risk of incarceration.

***The Personal Characteristics of Gong and Tang***

Gong's and Tang's personal characteristics undoubtedly are a mitigating factor. Their academic qualifications are sterling. Their professional achievements are remarkable. And, by all indications, they are devoted partners to one another and loving parents to their children. Outside of this crime, they have generally demonstrated integrity, decency, and honesty. This general good character makes their criminal offense all the more baffling and this sentencing more troubling; it marks the ruin of an American dream.

***The Need to Avoid Unwarranted Disparities Between Similarly Situated Defendants***

The government's recommended sentences here sit at the low-end of the sentencing guidelines (for Tang) or slightly below (for Gong). As the drafters of the United States Sentencing Guidelines explain, "Guideline sentences, in many instances, will approximate average pre-guidelines practice and adherence to the guidelines will help to eliminate wide disparity." U.S.S.G. Ch. 1, Pt. A § (4)(G).

A sentence of a significant period of incarceration is also not inconsistent with outcomes in cases involving similar offenses, including in this district. For example, *United States v. Stabile*, 19-CR-30041-MGM, involved a defendant who conspired to import a misbranded drug from China and introduce that misbranded drugs into commerce—all while falsely describing the drug as for research purposes only. Judge Mastroianni sentenced the defendant to 24 months of incarceration and ordered restitution of $1.8 million.

Finally, the disparity between the government's recommended sentences for the two defendants is explained by their relative culpability and the differences in the scope of the offense to which they

have each pleaded guilty: Gong has pled guilty and is responsible for the distribution of misbranded drugs, while Tang's conduct is more extensive—encompassing both the illegal importation of drugs into the United States as well as the distribution of the misbranded drugs.

*　　*　　*　　*　　*

Gong and Tang committed a serious and dangerous offense. They did so with full understanding of the wrongfulness of their conduct. And they did it out of greed—to earn hundreds of thousands of dollars in illegal profits.

This serious crime should be met with a significant sentence of incarceration.

CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court (i) impose a sentence upon Tang of 30 months incarceration, a fine of $250,000, 12 months of supervised release, and a mandatory special assessment of $100; and (ii) impose a sentence upon Gong of 27 months incarceration, a fine of $250,000, 12 months of supervised release, and a mandatory special assessment of $100.

Respectfully submitted,

UNITED STATES OF
AMERICA,

LEAH B. FOLEY
United States Attorney

*/s/ Christopher Looney*
CHRISTOPHER R. LOONEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

11

# CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*Christopher Looney*
Christopher R. Looney
Assistant United States Attorney

Dated: June 24, 2026